IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Milton Boyer and Kathy Boyer, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:14-cv-00286-wmc |
| ) | |
| Weyerhaeuser Company, et al., ) | |
| ) | |
| Defendants. ) | |

**OWENS-ILLINOIS, INC.'S
MOTION FOR RELIEF UNDER WIS. STAT. § 802.025**

Owens-Illinois, Inc. ("Owens-Illinois"), pursuant to Wis. Stat. § 802.025,[1] requests an order (1) compelling a sworn statement identifying each personal injury claim that Plaintiffs have filed or reasonably anticipate filing against asbestos trusts, (2) requiring Plaintiffs to file claims against at least the Owens Corning Fibreboard Asbestos Personal Injury Trust, the Manville Personal Injury Settlement Trust, and the G-I Holdings Inc. Asbestos Personal Injury Settlement Trust, and (3) staying this action until Plaintiffs swear that they have filed the claims.

**INTRODUCTION**

This case involves asbestos personal injury claims governed by Wisconsin substantive law. Plaintiffs allege that Milton Boyer developed mesothelioma from asbestos at a door plant in Marshfield, Wisconsin, owned and operated by Roddis Plywood Corporation and later by Weyerhaeuser Company. Pls.' Compl. ¶¶ 3, 15-21, ECF No. 1. Based on state law claims of negligence, product liability, nuisance, and civil

---

[1] Wis. Stat. § 802.025 is attached as Ex. A.

conspiracy, Plaintiffs seek to recover personal injury and punitive damages. *Id.* at 4-18. Under Wisconsin substantive law, Plaintiffs must therefore provide a sworn statement identifying each personal injury claim they have filed or reasonably anticipate filing against asbestos trusts. Wis. Stat. § 802.025(2). Further, this Court may order Plaintiffs to file claims against asbestos trusts identified by any defendant and stay this action until Plaintiffs swear or affirm that they have filed the claims. *Id.* at § 802.025(4).

## BACKGROUND

Two different compensation systems operate independently, with different rules, to compensate asbestos plaintiffs. Nearly 20 years ago, Congress established in the Bankruptcy Code a process to allow any company with significant asbestos liability to contribute funds to a trust that assumes the company's asbestos liability while barring civil asbestos litigation against the company. *See* 11 U.S.C. § 524(g). Asbestos plaintiffs are therefore compensated through the tort system, in lawsuits like this one, and through trusts formed by entities that have fled tort liability under Section 524(g). In both systems, the injury party is the same. In both systems, the underlying disease and damages are the same. And the alleged exposures are the same (or, at least, they should be). The transparency of the two systems, however, is dramatically different. The trusts make significant payments, but unless and until a plaintiff also obtains a verdict, tort system defendants, and trial courts, have little to no knowledge about the trust payments.

Bankruptcy trusts are a significant source of recovery for asbestos plaintiffs. Almost every company that was once the primary target of asbestos litigation has

entered bankruptcy and established trusts to compensate future claimants. The crippling impact of asbestos litigation has led over 100 companies to file for bankruptcy and create bankruptcy trusts. *See* Hon. Peggy L. Ableman, *The Garlock Decision Should Be Required Reading for All Trial Court Judges in Asbestos Cases*, 37 AM. J. TRIAL ADVOCACY 479, 480 (2014), *available at* http://goo.gl/WIMlD8 (last visited June 20, 2014); Marc C. Scarcella & Peter R. Kelso, *Asbestos Bankruptcy Trusts: A 2013 Overview of Trust Assets,* 12 Mealey's Asbestos Bankruptcy Report 33, 33 (June 2013), *available at* http://goo.gl/iyXFwP (last visited June 20, 2014). From 2006 through 2012 alone, approximately 60 trusts have distributed more than $15 billion in payments. *Id.* at 3. In 2012 the trusts distributed $1.25 billion. *Id.* at 35. At the end of 2012, these trusts held assets totaling over $18 billion. *Id.* at 2. In addition, there is approximately $11 to $12 billion in proposed funding from bankruptcies still pending confirmation. *Id.*

Using a "nonadversarial administrative process independent of the court system," bankruptcy trusts pay the claims. U.S. Government Accountability Office, *Asbestos Injury Compensation, The Role and Administration of Asbestos Trusts* at 3 (Sept. 2011), *available at* http://goo.gl/UeO6pa (last visited June 20, 2014). Claimants typically submit claims for either "expedited" or "individual" review. *Id.* at 17-18. Under expedited review, claims that meet certain criteria are assigned a scheduled value. The trusts establish scheduled values "to achieve relative equity among claimants." *Id.* at 17. As an alternative, a claimant can seek individual review to take additional factors into account. Notably, the GAO estimates that only "[t]wo to 3 percent of claims are processed through the individual review process, while most claims flow through the

expedited claims queue." *Id.* at 20. As a result, most claims submitted to bankruptcy trusts are relatively straightforward to value. But the amounts are not insignificant; recent research indicates that the typical mesothelioma asbestos bankruptcy trust claims can yield as much as $1.3 million — and the figure has been creeping toward the $2 million mark. *See* Charles Bates *et al.*, *The Naming Game*, 24:1 Mealey's Litig. Rep. Asbestos 4 (Sept. 2009), *available at* http://goo.gl/IbfwUs (last visited June 20, 2014).

Indeed, Plaintiffs' law firm advertises that "[y]ou are entitled to payments from bankruptcy claims because the Courts have set up trusts to compensate you for your exposure to these companies products":



*See* Cascino Vaughan Law Offices, Ltd., DAIRYLANDASBESTOS.COM, *available at* www.dairylandasbestos.com (last visited June 20, 2014). So Plaintiffs' law firm makes clear that it will "submit bankruptcy claims on your behalf." *See* Cascino Vaughan Law Offices, Ltd., *available at* www.cascinovaughan.com (last visited June 20, 2014).

This information is circumvented easily in the tort system. A plaintiff wishing to

- 4 -

avoid setoffs for trust payments and the risk of conflicting evidence can simply delay his or her trust claims until after the civil action concludes. In Owens-Illinois's experience, this practice is common. In fact, as the court overseeing Garlock's asbestos-related bankruptcy recently found,

> [i]t was a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that remaining tort system defendants would not have that information. One plaintiff's lawyer stated his practice as seemingly some perverted ethical duty: "My duty to these clients is to maximize their recovery, okay, and the best way for me to maximize their recovery is to proceed against solvent viable non-bankrupt defendants first, and then, if appropriate, to proceed against bankrupt entities."

*In re Garlock Sealing Tech., LLC*, 504 B.R. 71, 84 (W.D.N.C. 2014).

This failure — whether willful or negligent — of asbestos plaintiffs' counsel to respond timely and accurately to discovery or statutory disclosure requirements undermines the fairness of civil litigation. Trust claims information is vital in fairly valuing a case in light of potential setoffs or credits for money that has been, or is expected to be, recovered from asbestos bankruptcy trusts. As explained below, these double-recoveries have been a significant issue in asbestos litigation here in Wisconsin and elsewhere. The issue remains critical because solvent defendants, like Owens-Illinois, may end up paying more than their fair share in the tort system and bankruptcy trusts may end up paying claims by plaintiffs who already received full compensation for their injuries, draining trust assets available to future claimants.

Furthermore, bankruptcy trust claims contain discoverable information that is highly relevant in the civil case. When submitting claims to asbestos bankruptcy trusts, the claimant must provide a proof of claim form. *E.g.*, Manville Personal Injury

Settlement Trust, *Proof of Claim Form*, *available at* http://goo.gl/xRjsy2 (last visited June 20, 2014). That proof of claim form provides specific information about the claimant's work history and exposure to the asbestos-containing products — for which the trust distributes payments. *Id.* at 4-8. Trust filings also must be accompanied by an exposure affidavit. *E.g.*, Manville Personal Injury Settlement Trust, *2002 Trust Distribution Process* at 14, *available at* http://goo.gl/Tqag4v (last visited June 20, 2014). Defendants deprived of information about the totality of a plaintiff's asbestos exposures are deprived of the opportunity to develop defenses and defend themselves. But this Court has the power under Wis. Stat. § 802.025 to prevent Plaintiffs and their counsel from obtaining double-recoveries for the same injuries by strategically delaying the claims until after their tort case has concluded against solvent defendants.

## STATEMENT OF FACTS

### I. Plaintiff's Alleged Asbestos Exposure.

As noted above, Plaintiffs allege that Mr. Boyer developed mesothelioma from asbestos at a door plant in Marshfield, Wisconsin, owned and operated by Roddis Plywood Corporation ("Roddis") and by Weyerhaeuser Company ("Weyerhaeuser") after August 1, 1960. Pls.' Compl. ¶¶ 3, 15-21, ECF No. 1. Plaintiffs allege the "operations at the Marshfield plant involve cutting, sawing, and trimming of asbestos containing fire doors and cleanup, and disposal of the waste and scrap from such doors. At certain times the mixing of asbestos fibers to make the cores for the fire doors was a part of the manufacturing process." *Id.* at ¶ 15. In their interrogatory responses, Plaintiffs claim exposure from two types of products: (1) asbestos-containing core

materials, and (2) asbestos fibers. *See* Pls.' Resp. Standard Interrog. No. 19, attached as Ex. B.[2]

Documentary evidence is clear about the companies that did (and did not) sell those products to the Marshfield plant. Around 1954, Roddis first obtained approval from Underwriters' Laboratories, Inc. ("UL") to manufacture asbestos-containing fire doors. *See* Aff. June Thomas ¶¶ 1-4, Jan. 24, 2014, attached as Ex. C. UL approvals required Roddis (and later Weyerhaeuser) to follow a specific manufacturing process and use specific materials:

> Q  So when Roddis or Weyerhaeuser had a UL certification and it set forth the manufacturing and the materials that were used in that door to achieve that UL certification, Roddis and Weyerhaeuser would follow that UL certification?
>
> A  They had to.

Dep. Ronald Koepke 239:20-25, Feb. 18, 2014, attached as Ex. D.

### A. Johns-Manville and Ruberoid Company.

From 1954, Roddis specified in the UL certification that the asbestos-containing core material was manufactured by two companies: (1) Johns-Manville, and (2) Ruberoid Company (later known as GAF Corporation). *See* Aff. June Thomas at UL000001-UL000025; *see also* Letter from Johns-Manville Sales Corporation to Roddis

---

[2] Plaintiffs admit exposure to asbestos-containing core material from Johns-Manville and Owens-Corning Fiberglas (Kaylo) and asbestos fibers from North American Asbestos Corporation, Johns-Manville, and possibly the U.S. Government. Pls.' Resp. Standard Interrog. No. 19. Additionally, Plaintiffs contend that Weyerhaeuser purchased asbestos-containing door cores from Owens-Illinois, but as discussed below, their counsel has nothing (other than a patent license) that shows any connection between Owens-Illinois and the Marshfield plant.

Plywood Corporation, June 25, 1954, attached as Ex. E.  The UL certification shows the Johns-Manville Asbestocore and Ruberoid:

 

*Fire Door with Johns-Manville Asbestocore*          *Fire Door with Ruberoid*

*See* Aff. June Thomas at UL000017-UL000018.  There is no documentary evidence showing that Roddis manufactured fire doors with any other asbestos-containing core material before 1959.

**B.      Owens-Corning Fiberglas.**

On September 17, 1959, Roddis first placed a "special order" with Owens-Corning Fiberglas for ten packages of Kaylo asbestos-containing core material shipped to "Roddis Plywood Corp. Experimental." *See* Aff. Andrew Oh at OCFB 1, Jan. 30, 2014, attached as Ex. F.³  Around 1961, Weyerhaeuser then obtained approval from UL to

---

³ Owens-Illinois for a limited period of time ending on April 30, 1958, made and sold a high temperature thermal insulation product called Kaylo.  On April 30, 1958, Owens-Illinois sold the entire Kaylo business to Owens Corning Fiberglas — a separate company that continued to make and sell insulation under the brand name Kaylo into

- 8 -

manufacture fire doors with Owens-Corning Fiberglas Kaylo asbestos-containing core material. *See* UL File R3571, attached as Ex. G.

Between 1961 and 1972, Owens-Corning Fiberglas ultimately delivered more than 700 invoices worth of Kaylo asbestos-containing core material to the Marshfield plant. *See* Def. Owens Corning Responses to Plaintiff Pursuant to Court Order at Ex. 2, attached as Ex. H; *see also* Aff. Andrew Oh at OCFB 1-OCFB 771. In fact, the Marshfield plant is identified on the Owens-Coming Fiberglas approved site list for personal injury claims. *See* Owens Corning Fibreboard Asbestos Personal Injury Trust, *Owens Corning Approved Site List* at Site Codes 10016601, 10018691, *available at* http://goo.gl/0dXelO (last visited June 20, 2014).

    **C.    Johns-Manville, Owens-Corning Fiberglas, North American Asbestos, Carey of Canada, and the United States Government.**

In 1966 and 1967, Weyerhaeuser also developed its own asbestos-containing core material. Dep. Joseph Wendlick 329:5-12, Mar. 19, 2014, attached as Ex. I. Weyerhaeuser had several issues with Owens-Corning Fiberglas as the single supplier of asbestos-containing core material:

> Q.    In fact, Weyerhaeuser was buying core material at that time from only one supplier?
> 
> A.    Single source, yes.
> 
> Q.    Who was the supplier of the core material?
> 
> A.    Owens-Corning Fiberglass.
> 
> Q.    So given the price pressures, the single supplier problem, and likely some other problems,

---

the 1970s. Owens-Illinois did not make or sell Kaylo after April 30, 1958. *See* Agreement of May 9, 1958, attached as Ex. O.

> Weyerhaeuser decided to develop a mineral core of
> its own for its fire doors?
>
> A. Correct.

*Id.* at 328:16-329:1. In addition, Weyerhaeuser wanted a stronger, single core material that could be manufactured into the fire doors (rather than multiple cores with a tongue and groove design inside the fire doors). *Id.* at 332:21-333:24. So Weyerhaeuser chemically analyzed Owens-Corning Fiberglas Kaylo, and other asbestos-containing materials, and ultimately developed its own asbestos-containing core material. *Id.* at 330:15-332:20.

In 1968, Weyerhaeuser opened its new mineral core plant and began manufacture of its own asbestos-containing core material in Marshfield. *See* Dep. Ronald Koepke 62:9-12, May 1, 2007, attached as Ex. J; Dep. Ronald Koepke 19:19-21:11, Feb. 18, 2014. Weyerhaeuser purchased asbestos fibers from at least five sellers: Johns-Manville, Owens-Corning Fiberglas, North American Asbestos, Carey of Canada, and the United States Government. Dep. Ronald Koepke 59-60, 65, May 1, 2007; Dep. Ronald Koepke 243, Feb. 18, 2014; Aff. Margaret J. Baumgardner, Sept. 18, 2013, attached as Ex. K; Def. Owens Corning Responses to Plaintiff Pursuant to Court Order at Ex. 2. In June 1978, Weyerhaeuser ceased the use of asbestos in its core materials and fire doors. Dep. Ronald Koepke 253:20, Feb. 18, 2014.

## II. Patent License from Owens-Illinois.

Although Plaintiffs' counsel already have those documents and their clients admit exposure to those products, they have submitted *no* claim to any asbestos personal injury trust on behalf of their clients. *See* Pls.' Resp. Standard Interrog. No. 36;

Pls.' Resp. Bankruptcy Trust Interrog. Req. Prods. at 1-6, attached as Ex. L.  Plaintiffs' counsel also will not show their client written discovery related to the asbestos trusts or allow their client to answer deposition questions about the asbestos trusts.  *See* Dep. Milton Boyer 134:22-135:5, 126:6-133:14, June 16, 2014, attached as Ex. M.

Instead, Plaintiffs and their counsel have invented claims against Owens-Illinois — which have no foundation in Wisconsin law — based on a nonexclusive patent license to Roddis and Weyerhaeuser of U.S. Patent No. 2,593,050 (filed Jan. 24, 1952). No Wisconsin court has ever recognized a product liability action against a patent licensor.  Indeed, as explained in the pending motion to dismiss, Plaintiffs' allegations contravene both Wisconsin law and patent law.  *See* Owens-Illinois Mot. Dismiss, ECF No. 26.

Plaintiffs' counsel have represented that they have nothing (other than the patent license) that shows any connection between Owens-Illinois and this Marshfield plant:

> MR. CASCINO:  We have no documents. And if we do, there may be one or two invoices I saw, but I don't even believe, my legal assistant's saying no, shaking his head no is that there are none.
>
> So the only thing we have are, again, is what Riley provided us, which was an affidavit by him saying that they did have a process patent.
>
> THE COURT:  Okay. Well we will take that then as your representation with respect to having searched the materials, and you're telling me then you see nothing that shows any specific kind of connection, other than what you said with respect to information you have for Mr. Riley that I presume Mr. Casmere is aware of.

- 11 -

    MR. CASCINO: Yes, Your Honor. That's true.[4]

  Thus, Plaintiffs are already well aware of the companies that sold the asbestos and asbestos-containing products to the door plant in Marshfield, Wisconsin. Those companies have fled the tort system, declared bankruptcy due to their asbestos-related liabilities, and established personal injury trusts to pay injured individuals. And there may be numerous other trusts from which Plaintiffs can recover. However, Plaintiffs and their counsel have refused to identify the companies that should compensate, and likely will compensate, the Plaintiffs for the exact same injury that forms the basis for their baseless allegations in this case.

## ARGUMENT

**I. Wis. Stat. § 802.025 Is Substantive Wisconsin Law.**

  A federal court sitting in diversity applies state substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). "A substantive law is one motivated by a desire to influence conduct outside the litigation process, such as a desire to deter accidents, while a procedural law is one motivated by a desire to reduce the cost or increase the accuracy of the litigation process, regardless of the substantive basis of the particular litigation." *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 302 (7th Cir. 2010). "If an ostensibly procedural rule of state law is confined to a particular substantive area of law, this suggests that it probably was motivated by substantive concerns and therefore should be applied by the federal court in a case governed by

---

[4] Hr'g Tr. 8:19-9:7, *Seehafer v. Weyerhaeuser Co.*, No. 14-CV-00059 (E.D. Pa. Jan. 13, 2014), attached as Ex. N. Robert H. Riley is an attorney at Schiff Hardin LLP, and he did not provide such an affidavit.

state law." *Id.*; *accord S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 60 F.3d 305, 310 (7th Cir.) (citations omitted), *cert. denied*, 516 U.S. 1010 (1995) (finding "[one] class of pretty easy cases is where the state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, is limited to a particular substantive area, such as . . . tort law.").

Here, Section 802.025 is confined to a particular substantive area of law and was motivated by substantive concerns. The statute applies only to a claim "that is related to bodily injury or another harm . . . and that is allegedly caused by or related to the claimant's exposure to asbestos." Wis. Stat. § 802.025(b). And the Wisconsin legislature was motivated by a desire to influence conduct outside the litigation process, including the asbestos personal injury trusts and compensation for injured individuals. *See id.*; *see also* Hr'g Assem. Bill 19, Wisconsin Assemb. Comm. Judiciary, Apr. 4, 2013, *available at* http://goo.gl/EuhloJ (last visited June 20, 2014).

Furthermore, under the *Erie* doctrine, federal courts siting in diversity should consider whether there is a federal rule that addresses the matter. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010).[5]  If no federal rule

---

[5] The *Shady Grove* Court was divided, with Justice Scalia delivering a plurality opinion, and Justice Stevens concurring in the result but analyzing the question on narrower grounds than those relied upon by the plurality. Justice Scalia's plurality opinion, unlike Justice Stevens' concurrence, used a decisional framework that asked only "whether [the federal rule at issue] answers the question in dispute," and "[i]f it does, it governs-[the state law at issue] notwithstanding-unless it exceeds statutory authorization or Congress's rulemaking power." *Shady Grove*, 559 U.S. at 398 (citing *Burlington N R.R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987)). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those

applies or federal procedural rules can operate alongside state substantive law, then courts must make the "relatively unguided *Erie* choice" and consider "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Id.* at 417 n.2.

Under this *Erie* choice, Section 802.025 unquestionably should apply in this case. First, Plaintiffs and their counsel should be discouraged from filing personal injury cases in federal court to avoid the statutory requirements. Second, application of Section 802.025 will avoid the inequitable administration of Wisconsin law. Wisconsin's "intention to influence substantive outcomes is manifest and would be defeated by allowing parties to shift their litigation into federal court unless the state's rule was applied there as well." *S.A. Healy Co.*, 60 F.3d at 310 (citations omitted). Indeed, a strategic delay in the submitting trust claims, which deprives a tort defendant of setoffs, is neither equitable nor consistent with the purpose of Wisconsin personal injury law.

For all of these reasons, this Court sitting in diversity should apply Section 802.025 as Wisconsin substantive law.

## II. Plaintiffs Must Comply with Wis. Stat. § 802.025.

Section 802.025 provides several requirements for asbestos personal injury claims. Within 45 days after filing the case, a plaintiff must provide a sworn statement identifying all personal injury claims that the plaintiff has or reasonably anticipates filing against a personal injury trust. Wis. Stat. § 802.025(2). This statement must

---

Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quotations omitted).

"include the name, address, and contact information for the asbestos trust, the amount claimed by the plaintiff, the date that the plaintiff filed the claim, the disposition of the claim and whether there has been a request to defer, delay, suspend, or toll the claim against the asbestos trust." *Id.* at § 802.025(2)(a).

Within 60 days after filing the case, a plaintiff also must produce the final executed proof of claim for each claim filed against a personal injury trust and any reasonably anticipated claims. *Id.* at § 802.025(2)(b). For both present and reasonably anticipated claims, plaintiff must produce the trust claims materials. *Id.* at § 802.025(2)(b)-(c). Those trust claims materials mean "all documents and information relevant or related to a pending or potential claim against an asbestos trust" and include "claims forms and supplementary materials, proofs of claim, affidavits, depositions and trial testimony, work history, and medical and health records." *Id.* at § 802.025(1)(c). The plaintiff must supplement the information within 30 days after he or she files a claim or receives information or documents related to any claim he or she makes against an asbestos trust. *Id.* at § 802.025(2)(d).

Moreover, a defendant may file a motion for an order requiring the plaintiff to file a claim against a personal injury trust and staying the case. *Id.* at § 802.025(4)(a). "If any defendant identifies an asbestos trust not named by the plaintiff against which the defendant reasonably believes the plaintiff should file a claim, upon motion by the defendant, the court shall determine whether to order the plaintiff to file a claim against the asbestos trust. The defendant shall provide all documentation it possesses or is aware of in support of the motion." *Id.* If the court orders the plaintiff to file a claim,

"the court shall stay the immediate action until the plaintiff swears or affirms that he or she has filed the claim against the asbestos trust and the plaintiff provides to the court and to all parties a final executed proof of claim and all other trust claims materials relevant to each claim the plaintiff has against an asbestos trust." *Id.* at § 802.025(4)(c).

And finally, if a verdict is entered in favor of the plaintiff, Section 802.025 prohibits the plaintiff from collecting any amount of damages until after he or she has assigned the rights or claims to the defendant. *Id.* at § 802.025(6). Given the significance, Section 802.025 makes a plaintiff subject to sanctions if he or she fails to timely provide the foregoing disclosures or information. *Id.* at § 802.025(7).

### III.     Plaintiffs Have Failed to Comply with Wis. Stat. § 802.025.

Although Plaintiffs filed this action 63 days ago on April 18, 2014, they have failed to comply with either the 45-day or the 60-day disclosure requirements of Section 802.025. Wis. Stat. § 802.025(2)(a)-(b). In fact, Plaintiffs and their counsel have submitted no claim to any asbestos personal injury trust — even though they admit exposure to asbestos-containing core materials from Johns-Manville and Owens-Coming Fiberglas (Kaylo) and asbestos fibers from Johns-Manville. *See* Pls.' Resp. Standard Interrog. Nos. 19, 36; Pls.' Resp. Bankruptcy Trust Interrog. and Req. Production at 1-6.

Worse still, Plaintiffs' counsel will not show their client written discovery related to asbestos personal injury trusts. *See* Dep. Milton Boyer 134:22-135:5, 126:6-133:14. Nor will Plaintiffs' counsel allow their client to answer deposition questions about asbestos personal injury trusts. *Id.* At the same time, however, Plaintiffs have testified that they

need the money and cannot afford better medical treatment (likely because their attorneys have not filed any asbestos personal injury trust claims or any workers' compensation claims). *See* Dep. Milton Boyer 11:16-17. This type of litigation gamesmanship is exactly the reason for Section 802.025 and disclosure of asbestos personal injury trust materials, as Owens-Illinois explained during the telephonic hearings on Plaintiffs' motion to hold Mr. Boyer's deposition on a highly expedited basis. *See* Motion Hr'g, ECF Nos. 31, 39. The delayed disclosures and expedited deposition, in effect, creates an ambush.

Here, as explained in *In re Garlock*, the "regular practice by many plaintiffs' firms [is] delay filing trust claims for their clients so that their remaining tort system defendants would not have that information." *In re Garlock*, 504 B.R. at 84. The *Garlock* court documented many similar instances of abuse and fraud stemming from delayed filing of bankruptcy trust claims. As the court explained,

> In a California case involving a former Navy machinist mate aboard a nuclear submarine, Garlock suffered a verdict of $9 million in actual damages. The plaintiff did not admit to any exposure from amphibole insulation, did not identify any specific insulation product and claimed that 100% of his work was on gaskets. Garlock attempted to show that he was exposed to Unibestos amphibole insulation manufactured by Pittsburgh Coming. The plaintiff denied that and, moreover, the plaintiff's lawyer fought to keep Pittsburgh Coming off the verdict form and even affirmatively represented to the jury that there was no Unibestos insulation on the ship. But, discovery in this case disclosed that after that verdict, the plaintiff's lawyers filed 14 Trust claims, including several against amphibole insulation manufacturers.

*Id.* Thus, not only was Garlock deprived of evidence that the plaintiff was exposed to other, more potent forms of asbestos, Garlock was unable to setoff payments by as

many as 14 bankruptcy trusts against a substantial verdict. Troubled by the abuse uncovered in *Garlock*, Judge Peggy Ableman, who formerly oversaw Delaware's asbestos docket, has recently stressed that courts nationwide "can and should take steps to eliminate the opportunity for lawyers to game the system through strategies such as withholding trust claims until the tort case is concluded." Hon. Peggy L. Ableman, *The Garlock Decision Should Be Required Reading For All Trial Court Judges In Asbestos Cases*, 37 AM. J. TRIAL ADVOCACY 479, 486 (2014).

This Court should not condone these tactics. Nor should Owens-Illinois be prejudiced by whether Plaintiffs have strategically delayed their bankruptcy trust claims or strategically filed their tort lawsuit in federal court. Plaintiffs have legitimate personal injury trust claims worth significant amounts of money. Requiring Plaintiffs and their counsel to submit those claims and disclose the information will provide the full picture of Mr. Boyer's asbestos exposure. Without this information, however, Owens-Illinois is forced into expedited discovery with only a fraction of the relevant evidence, while Plaintiffs set up double-recoveries from both the tort and bankruptcy trust systems. Under Section 802.025, this Court has the power to use this case as an opportunity to address and admonish this type of gamesmanship.

## **CONCLUSION**

Pursuant to Wis. Stat. § 802.025, therefore, Owens-Illinois requests an order (1) compelling a sworn statement identifying each personal injury claim that Plaintiffs have filed or reasonably anticipate filing against asbestos trusts, (2) requiring Plaintiffs to file claims against at least the Owens Corning Fibreboard Asbestos Personal Injury Trust,

the Manville Personal Injury Settlement Trust, and the G-I Holdings Inc. Asbestos Personal Injury Settlement Trust, and (3) staying this action until Plaintiffs swear that they have filed the claims.

Dated: June 20, 2014

Respectfully submitted,

By: /s/ Brian O. Watson
Edward Casmere
Brian O. Watson
Schiff Hardin LLP
233 S. Wacker Dr. Suite 6600
Chicago, Illinois 60606
(312) 258-5500
(312) 258-5600 (facsimile)

*Attorneys for Defendant*
*Owens-Illinois, Inc.*

## CERTIFICATE OF SERVICE

I certify that on June 20, 2014, these papers were filed with the Clerk of the Court for the United States District Court for the Western District of Wisconsin using the CM/ECF system, which will send notification of such filing upon all parties who have appeared.

/s/ Brian O. Watson
Brian O. Watson